UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| THE CITY OF ATLANTA, GEORGIA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action File No. |
| | : | 1:13-cv-02480-SCJ |
| AVERY PARK PARTNERS, LLC | : | |
| d/b/a Avery Park, COLONY CREEK, | : | |
| LLC, AND THE CITY OF COLLEGE | : | |
| PARK, GEORGIA, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY
AVERY PARK PARTNERS, LLC AND COLONY CAMP CREEK, LLC**

Defendants Avery Park Partners, LLC ("**Avery**") and Colony Camp Creek,

LLC ("**Colony**"), through undersigned counsel, respectfully file this brief in

support of their motion for summary judgment.

I.  **INTRODUCTION**

This case presents pure legal questions concerning the operation of the City

of Atlanta, Georgia's ("**Atlanta**") 2008 noise compatibility program ("**NCP**")

associated with the Hartsfield-Jackson Atlanta International Airport ("**Airport**").

The NCP is administered by Atlanta as owner/operator of the Airport under the

authority and jurisdiction of the Federal Aviation Administration ("**FAA**").  It is

designed to remediate aircraft noise near the Airport.  Through the NCP, the FAA "make[s] federal funds available to reduce incompatible land uses in the vicinity of airports caused by aircraft noise."  (Compl. ¶ 11.)

In the most general terms, the NCP states that Atlanta will acquire noise-impacted properties near the Airport and for certain, slightly less noise-impacted properties, it will provide and install sound insulation.

The questions in this case arise from the Atlanta's decision **not** to acquire, under the NCP, two apartment complexes which belong to Avery and Colony. There is no dispute that these two complexes meet the criteria for acquisition under the NCP.  Atlanta's designated representative freely admits this fact.

However, these two properties have fallen victim to political squabbling between the Atlanta and its neighbor, College Park.  College Park objects to the acquisition of any apartment properties within its boundaries because this would negatively impact its already dwindling population.  In 2008, after Atlanta worked with the FAA to update its NCP to cover the noise impacts created by the "fifth runway" at the Airport, College Park immediately filed suit to stop the acquisitions (the "**College Park Litigation**").[1]  Atlanta prevailed in the College Park Litigation.

---

[1] *City of College Park, et al. v. City of Atlanta, et al.*, Civ. Act. No. 1:08-cv-1464-JEC.

However, College Park appealed.  When the Eleventh Circuit ordered the parties to mediation, the cities agreed to a Consent Order to resolve their dispute.  The Consent Order purportedly requires Atlanta to revise its 2008 NCP to remove any authority to acquire apartment complexes within College Park.

About two years after the Consent Order, Atlanta finally submitted a letter to the FAA asking to revise its NCP.  However, the FAA has not consented, and the NCP has not been amended, presumably because the FAA required Atlanta to revise its NCP to include multifamily properties in the first place, as explained more fully below.  Regardless, Atlanta claims that the only present obstacle to the acquisition of the two apartment complexes owned by Avery and Colony is the Consent Order.  Apart from the fact that the Consent Order does not specifically bar Atlanta from acquiring property in College Park, it is ineffective to alter the NCP.  Moreover, it cannot be used to limit the rights of Avery and Colony to have their properties acquired pursuant to the NCP because they were not parties to the Colony Park Litigation or settlement.

The first question for the Court to address on summary judgment is whether the Consent Order is an effective means to amend the NCP.  It is not.  The rules and regulations applicable to the NCP create an administrative procedure for its amendment, and vest the authority for passing on any such amendment with the

- 3 -

FAA.  While the district court may have been within its right to order Atlanta to *attempt* to amend the NCP, the Court has no authority to amend the NCP itself.  Moreover, Atlanta admits that the NCP was not amended by the Consent Order.

The second question is whether the Consent Order, which was entered without the participation or input of Avery and Colony (or any opportunity for public comment), can strip them of rights which otherwise would have been available to them pursuant to the NCP.  Due process requires that it cannot.

The third question is whether the NCP creates an enforceable right for Avery and Colony, who own qualified properties in areas that are significantly impacted by aircraft noise.  As demonstrated below, Defendants absolutely have the right to demand that their properties be acquired consistent with the terms of the NCP.  The FAA approved the NCP based on its and the public's understanding that the program would be administered to allow certain qualified property owners to *choose* whether to have their properties acquired.  In fact, as a **condition** of the FAA's agreement to provide approval and federal funds for the construction of a fifth runway at the Airport in 2001, the FAA required Atlanta to update its NCP to include multifamily properties, particularly because of the disparate impact the noise from an additional runway would inflict on minorities living in the area.  Atlanta's position that it is now free to pick and choose properties to be acquired

based entirely upon its own political necessities is baseless.

## II.  <u>RELIEF REQUESTED</u>

Defendants Avery and Colony seek a summary judgment ruling that:

(a)    The Consent Order is ineffective to amend the NCP;

(b)    The Consent Order cannot bind or affect the rights of Avery or Colony under the NCP because they were not parties to the College Park Litigation; and

(c)    The NCP remains in effect, and, absent an amendment approved by the FAA, Atlanta must continue acquiring and soundproofing qualified properties pursuant to its terms.

## III. <u>STATEMENT OF UNCONTESTED MATERIAL FACTS</u>

Avery and Colony incorporate by reference their Statement of Uncontested Material Facts (cited "SMF ¶ ___"), as fully as if set forth verbatim herein.

## IV. <u>ARGUMENT & CITATION OF AUTHORITIES</u>

### A.  <u>Summary Judgment Standard</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movement is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The moving party bears the initial burden of showing the court, by reference to materials in the record, that

there is no genuine dispute as to any material fact that should be decided at trial." *F.D.I.C. v. Skow*, 955 F. Supp. 2d 1357, 1367-68 (N.D. Ga. 2012) aff'd in part sub nom. *F.D.I.C. v. Skow*, 741 F.3d 1342 (11th Cir. 2013).[2]  "The moving party's burden is discharged merely by '"showing"—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case.'"  *Skow*, 955 F. Supp. 2d at 1367-68 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)).  "Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute."  *Skow*, 955 F. Supp. 2d at 1368 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

    B.   **Avery and Colony's Properties Should be Acquired Under the Existing NCP**

      1.   **Federal Law Requires Acquisition of Qualifying Properties Within the 70 DNL Noise Contour**

The Noise Control Act of 1972, 42 U.S.C. § 4901 *et seq.* and 49 U.S.C. § 44715 ("**Noise Control Act**") declares that it is "the policy of the United States to promote an environment for all Americans free from noise that jeopardizes their

---

[2] *See also Rindfleisch v. Gentiva Health Servs., Inc.*, Civ. Act. No. 1:10-CV-03288, 2013 WL 4494375, p. *5 (N.D. Ga. July 26, 2013); *Lehman Bros. Holdings, Inc. v. Pine State Mortgage Corp.*, Civ. Act. No. 1:09-CV-01596-SCJ, 2012 WL 1606227, p. *4 (N.D. Ga. Apr. 23, 2012).

health or welfare." 42 U.S.C. § 4901(b). (SMF ¶ 17.) In addition, the Noise Control Act gave the FAA Administrator the authority to "to relieve and protect the public health and welfare from aircraft noise and sonic boom." 49 U.S.C. § 44715(a)(1)(A). (SMF ¶ 18.)

In addition, the Aircraft Safety and Noise Abatement Act of 1979, 49 U.S.C. § 47501, *et seq.* ("**Noise Abatement Act**"), establishes a national program to address aircraft noise, and authorizes the FAA to regulate "airport noise compatibility planning" and to make federal funds available to reduce incompatible land uses in the vicinity of airports caused by aircraft noise. (SMF ¶ 19.)

Federal policy recognizes "the effects of airport capacity expansion projects on aircraft noise," and that "[e]fforts to increase capacity through any means can have an impact on surrounding communities." 49 U.S.C. § 47101(c). Accordingly, federal law requires that airports be "constructed and operated to minimize current and projected noise impact on nearby communities." 49 U.S.C. § 47101(a)(2). Additionally, "[n]oncompatible land uses around airports must be reduced and efforts to mitigate noise must be given a high priority." 49 U.S.C. § 47101(c).

To assist in the implementation of the policies discussed above, Congress

recruited the federal agencies, including the FAA, authorizing and directing them "to the fullest extent consistent with their authority … [to] carry out the programs within their control in such a manner as to further the policy declared in section 4901(b) of this title."  42 U.S.C. § 4903(a).  In addition, Congress has directed the federal government to assist state and local governments financially with their efforts to remediate harmful aircraft noise.  In particular, Congress instructed, "[w]hile primary responsibility for control of noise rests with State and local governments, Federal action is essential to deal with major noise sources in commerce control of which require national uniformity of treatment."  42 U.S.C. § 4901(a).

To implement both the Noise Control Act and the Noise Abatement Act, the FAA established the Airport Noise Compatibility Planning Process as part of the Federal Aviation Regulations. 14 C.F.R., Part 150 ("**Part 150**").  (SMF ¶ 20.)  Part 150 establishes uniform national methods for preparing noise exposure maps ("**NEM**").  (SMF ¶ 21.)  NEM depict "noise contours," which are areas on the maps where computer-modeled average annual noise levels are indicated in a unit of measurement known as "DNL."  (SMF ¶ 22.)  A DNL is a measure of noise exposure in decibels over a 24-hour period, weighted more heavily toward nighttime hours.  (SMF ¶ 23.) The Part 150 regulations also set forth procedures,

standards and methodologies for an airport's creation and implementation of a Noise Compatibility Program ("**NCP**") based on the NEM, which is used to reduce noise impact near the airport.[3]  (SMF ¶ 24.)

Atlanta's current NCP declares that the impact within the 70 DNL and greater noise contour is incompatible with the operation of a multifamily residential property, and that the owners of those properties will have the option to have their properties acquired at fair market value.  In particular, the NCP states that "[t]he current DOA administration recognizes [876 residential structures located within the 70-74 DNL of the 2007 NEM] as being noise sensitive and as a mitigation measure proposes to acquire eligible multi-family structures and complexes located between the 70-74 DNL contours."  (SMF ¶ 86.)  The NCP identifies specific properties that are being significantly impacted by aircraft noise, as shown in NCP Figure 6-2.  (*See* 2008 NCP Vol II. Fig. 6.2, at Ex. B.)  Both Avery and Colony's properties are shown on NCP Figure 6-2 within the 70 DNL noise contour and are therefore slated for acquisition.  (*Id.*)  Thus, under Atlanta's existing NCP, Avery and Colony have the option of having their properties acquired by Atlanta at fair market value.  (SMF ¶¶ 50-58.)

---

[3] For an additional explanation of how Part 150 works to remediate noise, see *City of Bridgeton v. Federal Aviation Administration*, 212 F.3d 448, 460 (8th Cir. 2000), which provides an alternate description of how NEM are prepared and used in conjunction with an NCP.

The NCP was approved by the FAA in its January 25, 2008, Record of Approval ("2008 ROA"), which states:

> Voluntary property acquisition program for eligible single-family residences and multi-family complexes within the 70 DNL contour. This voluntary measure would provide the opportunity for owners and residents of residentially developed property within the high noise areas (2007 NEM 70 DNL and greater) to receive fair market value for their property and relocation assistance. Any residential development that occurred after April 10, 1985 that was within the limits of the 1985 70 and greater DNL contour was constructed with the knowledge of the extent of significant noise exposure and would not be eligible for the acquisition program. (NCP pages 6-1 thru 6-4, 8-2, 9-1, and 9-11; Figures 6-1 and 6-2; Tables 6.1 and 9.2)
>
> **FAA Action**: Approved for the properties identified in the NCP, Figure 6-2.

(*See* 2008 ROA, p.1, at Counterclaim Exhibit D.)

Atlanta's commitment in the NCP to acquire multifamily properties in the 70 DNL and above noise contour was more than just a pie-in-the-sky proposal. It was the fulfillment of a commitment that Atlanta had made previously to the FAA in order to secure both permission and funding to build a fifth runway at the airport. (SMF ¶¶ 32-44.) The FAA approved Atlanta's plans to build the fifth runway in a 2001 Record of Decision (SMF ¶ 34), but required Atlanta to update its NCP in light of the additional noise the runway would create. The FAA also specifically required Atlanta to include the acquisition of multifamily properties. (SMF ¶¶ 35,

41-42.)  The basis for this requirement was the FAA's concern that the multifamily properties near the airport were predominantly minority-occupied, and that the resultant noise would have a disproportionate impact on minorities.  (SMF ¶¶ 41-42.)  Thus, when Atlanta accepted federal money for the construction of its fifth runway, it was only able to do so because it had promised the FAA that it would update its NCP to acquire affected multifamily properties as part of an "economic justice" (or "EJ") effort.  (SMF ¶¶ 41-42.)

Regardless of its promises to the FAA and the requirements of economic justice, Atlanta would have been required to update its NCP after building the fifth runway anyway.  Part 150 requires an NCP sponsor, such as Atlanta, to update its NEM and then its NCP to account for modifications to the noise contours around the airport which occur when "any change in the operation of the airport would create any 'substantial, new noncompatible use,'" such as opening a new runway which creates new and additional noise.  14 C.F.R. §§ 150.21 and 150.23.

In light of the FAA's requirements in the 2001 ROD and the construction of the additional runway, Atlanta committed to feasible and prudent noise abatement measures through the noise insulation or acquisition of affected properties in the 65 – 75+ DNL noise contours.  The FAA's approval of the updated NCP in 2008 creates an enforceable federal standard under the Noise Control Act, the violation

of which subjects Atlanta to civil liability.  *See* 42 U.S.C. § 4911(a), and (f); 49 U.S.C. § 44715(a)(1)(A)(ii).  By approving the NCP, the FAA has instituted the required "national uniformity of treatment," and has created an enforceable standard for the state and local government to carry out a program to "protect the public health and welfare from aircraft noise and sonic boom."  49 U.S.C. § 44715(a)(1)(A).  In return for its commitment to carry out the NCP, Atlanta receives certain statutory benefits, such as protection from lawsuits that seek damages incurred from being close to an airport.  *See* 49 U.S.C. § 47506.  Regardless, the Noise Control Act plainly subjects Atlanta to liability for failing to implement its NCP consistent with its terms.  Federal law and policy uniformly require Atlanta to construct and operate its Airport in a manner that minimizes the impact of harmful aircraft noise, which, in this particular case, requires the acquisition of the Avery and Colony properties consistent with the requirements of the NCP.

### 2.   Atlanta Admits that Avery and Colony's Apartments Are Appropriate for Acquisition Under the Existing NCP

All parties admit that Avery and Colony's properties are located within the 70 DNL noise contour.  (SMF ¶ 57.)  Further, Atlanta admits that the purpose of its current NCP was to permit acquisition of multifamily properties such as those

- 12 -

owned by Avery and Colony, and that, but for the City's position concerning the Consent Order, both properties would be candidates for acquisition under the existing NCP. (SMF ¶ 58.) Specifically, Dr. Nissalke testified:

> Given that they are inside the 70, they would indeed be -- they would be candidates. That's what we had -- that was -- that's what we had conveyed in the 2007 NCP as far as acquisition of multifamily structures inside the 70. So, yes, they would be candidates assuming that they can meet other criteria, you know, good title. They convey easements. We arrive at a negotiated price, absolutely.

(SMF ¶ 58.)

### 3. Refusing to Acquire Avery and Colony's Properties Would Violate Atlanta's Federal Grant Assurances and Amount to Fraud on the FAA and the Public

If Atlanta is not required to comply with its NCP, it will have perpetrated a fraud on the FAA and on the public. As explained above, the FAA approved and funded the construction of the fifth runway based on Atlanta's commitment that it would update its NCP and offer property acquisition and relocation services to multifamily properties within the 70+ DNL noise contour. (SMF ¶¶ 35, 41-42.) That commitment to acquire these multifamily properties within the 70+ DNL noise contour was contained in Atlanta's proposed NCP in 2007. (SMF ¶¶ 55-56.) When submitting the proposed NCP to FAA for approval, Atlanta reported that it would use a budget of roughly $28 million for the acquisition of seven multi-

- 13 -

family residential properties.  (SMF ¶ 86.)  Specifically, Atlanta wrote:

> A review of the existing land use indicates that approximately 876 residential structures are located within the 70-74 DNL of the 2007 NEM.  Of these residences, it is estimated that three are single-family and 873 are multi-family units in seven apartment complexes. All of these units are located within the City of College Park. **The current DOA administration recognizes them as being noise sensitive and as a mitigation measure proposes to acquire eligible multi-family structures and complexes located between the 70-74 DNL contours.**
>
> The Fulton County Board of Assessors (BOA) website was referenced to help estimate property values of the residences for potential acquisition. The three single-family properties ranged from a 2006 value of $46,900 to $81,500 (based on 2005 "Appraised Values" for purposes of 2006 taxes) while the per-unit value for rental properties averaged just over $32,000. In developing the fair market values used in the Study, it was noted that the Fulton County BOA sets an Appraised Value target for tax purposes equal to 90 percent of fair market value. Therefore, in estimating fair market value a multiplier factor of 1.11 was applied to the BOA Appraisal Values to adjust the valuation from 90 percent to 100 percent of the market value. However, in cases where recent sales exceeded this multiplier, the actual sale price of the property was used in this study instead of the lower calculated number. Based on this approach, it was estimated that the cost of the acquisition of the three homes would total roughly $208,667. **Using a similar approach, the cost of acquisition of the multi-family buildings (873 units) would cost approximately $28 million dollars.**

(SMF ¶ 86.)

When the FAA issued its ROA approving the NCP, the FAA specifically

stated that qualifying property owners within the 70 DNL contour would be given

the option to have their properties acquired.  (SMF ¶ 85.)  In particular, the FAA

wrote:

> The Department of Aviation has clarified, and the ADO concurs, that
> non-compatible land uses that lie within both the 70 and 65 DNL
> contours **will have the option of selecting acquisition** or sound
> insulation for the property.

(*See* SMF ¶¶ 56, and 85.)  Moreover, after the FAA approved the updated NCP,

Atlanta received federal grant money to substantially pay for the cost of its sound

insulation and property acquisition programs.  *See* FAA, THE FAR PART 150

AIRPORT NOISE COMPATIBILITY PROGRAM, AN OVERVIEW, p. 1 (explaining that "an

approved Part 150 NCP is the primary vehicle for gaining approval of applications

for Federal grants for noise abatement projects…"), available at

http://www.faa.gov/about/office_org/headquarters_offices/apl/noise_emissions/pla

nning_toolkit/media/II.B.pdf.

Because Atlanta has accepted federal grant money pursuant to its NCP and

for other Airport projects, federal law requires the City to have made certain

written grant assurances to the Secretary of Transportation.  *See* 49 U.S.C.A.

§§ 47504(c), and 47104—47107.  Accordingly, the NCP acknowledges that "[t]he

terms and conditions [of the Federal Grant Assurances] become applicable when

the airport sponsor accepts a grant offer from the FAA."  (2008 NCP Vol. II p. G-

7, at SMF Ex. B.)

Paragraph C.16. of the FAA's standard grant assurances requires that the Airport:

> **will execute the project subject to plans, specifications, and schedules approved by the Secretary.**  Such plans, specifications, and schedules shall be submitted to the Secretary prior to commencement of site preparation, construction, or other performance under this grant agreement, and, upon approval of the Secretary, shall be incorporated into this grant agreement.  **Any modification to the approved plans, specifications, and schedules shall also be subject to approval of the Secretary, and incorporated into this grant agreement.**

*See* FAA, Grant Assurances Airport Sponsors ¶ A.1 (emphasis added), available at http://www.faa.gov/airports/aip/grant_assurances/media/airport_sponsor_assurances_2012.pdf.  In other words, to receive federal grant money for a Part 150 program, a city must provide written assurances to the federal government that it will actually *execute* its Part 150 program consistent with its terms, and the plan cannot change without an amendment approved by the FAA.  *Id.*

Like federal law, Georgia law also requires Atlanta to comply with its NCP and federal grant assurances in the execution of its Part 150 program.  Section 36-87-2(d)(2) of the Georgia Local Government Efficiency Act authorizes counties and municipalities to participate in federal programs and to "[a]ccept and expend [federal] grant funds **subject to such terms as may be required by the**

- 16 -

**grantor**…." O.C.G.A. § 36-87-2(d)(2) (emphasis added).

Because the City has accepted and expended[4] federal grant money, it is required by law to implement the NCP consistent with its terms, including the acquisition of qualified multifamily properties within the 70+ DNL contour. This includes Avery and Colony's apartment properties. Atlanta cannot be free to engage in a bait-and-switch, wherein it promises multifamily acquisition in order to get the substantial funding required to build the fifth runway and then, once it has received the money and the runway has been built, the City fails to fulfill its obligations under the NCP.

A similar question (concerning sound insulation) was resolved in favor of the noise-impacted property owner in *Minnesota, et al. v. Metropolitan Airports Commission, et al.*, Civ. Act. No. MC 05-5474, 2005 WL 5569259 (Minn. Dist. Ct. Nov. 30, 2005) (Order Denying Def.'s Mot. to Dismiss). In *Metropolitan Airports Commission*, the plaintiffs "[sought] relief in the form of requiring Defendants to follow through with previously stated noise mitigation programs in the DNL 60 dB for residents who are dealing with the harm generated by these noise levels now."

---

[4] In fact, Atlanta has already used federal funds disbursed under the NCP to acquire one multifamily property within College Park, *i.e.*, Wynterbrook. Defendants Avery and Colony simply seek to be treated consistently with the owner of Wynterbrook pursuant to the NCP.

- 17 -

2005 WL 5569259, p. 14.  The Minnesota District Court ultimately concluded that the plaintiffs' mandamus claim should proceed to trial based in large part upon a finding that the defendant had secured federal grant money for its NCP by representing that it would be administered in a certain way, which the defendants were trying to depart from after the fact.  *Id.*  Assuming based on the evidence before it that the state agency actually could have been attempting to renege on the public commitments it had made in order to secure funding for its airport and NCP, the court denied summary judgment and sent the case to trial, holding:

> A case could be made that the "sequence" of events orchestrated by a state agency, and the "constellation" of documents and approvals secured by the state agency, themselves create an environmental quality standard, limitation, rule or order, worthy of protection under MERA.
>
> The Court is persuaded that Plaintiffs' claim, as outlined, is serious and deserving of a chance to be developed on a full record in the event of appellate review.  It should not be easy for public bodies to break commitments on which so many private and public entities have claimed to rely.

*Metropolitan Airports Commission*, 2005 WL 5569259, p. 28.

Just like the plaintiff in the *Metropolitan Airports Commission*, Avery and Colony are property owners within the appropriate DNL noise contour, and they have a clear legal right to participate in the acquisition portion of the City's NCP. Additionally, Atlanta has begun implementation of its Part 150 program by

- 18 -

acquiring the Wynterbrook apartments, and it has received substantial federal grant money doing so. Accordingly, both federal and Georgia law require the City to implement its Part 150 program faithfully, consistently, and pursuant to its terms. Moreover, if Atlanta is allowed *not* to fulfill its obligations under the NCP, it will have effectively defrauded the FAA and the public. Thus, an order from the Court compelling the City to comply with the terms of its Part 150 program is warranted. *See* O.C.G.A. § 9-6-20.

### C. The Consent Order is Ineffective to Amend the NCP.

#### 1. Atlanta Admits that its 2008 NCP Has Not Been Amended

In August 2010, the District Court in the College Park Litigation entered the Consent Order, which states in relevant part:

> Atlanta agrees to modify its current Part 150 Program to eliminate authorization to acquire any apartment complex within College Park other than Clubhouse Apartments, located at 3800 Hershel Road. For the purposes of this Consent Order, an apartment complex means any building with four (4) or more residential units.

(SMF ¶ 65.) Atlanta delayed even attempting to comply with this provision of the Consent Order until September 14, 2012, more than two years later. (SMF ¶¶ 67-69.) Regardless, Atlanta admits that the FAA has not approved its proposed revision to the NCP. (SMF ¶ 81 (admitting "[t]he FAA has not approved it").)

- 19 -

### 2. The Consent Order is Ineffective to Amend Atlanta's Part 150 Program as a Matter of Law

In the Noise Abatement Act, Congress assigned the Secretary of Transportation the authority to consider and approve of airport NCPs. 49 U.S.C. § 47501. The Part 150 regulations state that "no approval of any noise compatibility program, or any portion of a program, may be implied in the absence of the FAA's express approval." 14 C.F.R. § 150.35(a). The decision to approve or deny an NCP cannot be made on a whim. Rather, Part 150 sets forth a detailed and highly technical analysis which the FAA is required to make as the basis for its rulings. 14 C.F.R. § 150.33(a)-(d) (describing the standard for approval of an NCP). Further, Part 150 requires the FAA to be involved in the process of actually **developing** each proposed NCP prior to its submission for approval. 14 C.F.R. § 150.23(c)-(d).

Plainly, the process of creating, reviewing and approving proposed NCPs requires the specialized knowledge and input of the FAA, and is not well suited to judicial determination. Regardless, the Noise Abatement Act and Part 150 both state that the FAA—as opposed to a federal district court—must conduct the analysis, and that the FAA is the only party with the authority to accept or deny a proposed NCP. 14 C.F.R. §§ 150.33(a)-(d), 150.35(a). Thus, it appears that the

- 20 -

federal district court should have abstained from issuing a Consent Order which directs the amendment of the 2008 NCP, because in doing so, the court ruled on a non-judiciable political question that had been assigned to an administrative agency working under the direction of Congress.  *Cf. Carmichael v. Kellogg, Brown & Root Services, Inc.*, 572 F.3d 1271, 1281 (11th Cir. 2009) ("a political question is raised when a suit requires reexamination of issues entrusted by the Constitution's text to a coordinate political department").

### 3. Neither Avery nor Colony Were Parties to the College Park Litigation and CANNOT be Bound by the Terms of the Consent Order

Even if a federal district court had the authority to order Atlanta to propose an amendment to its NCP, the Consent Order cannot strip Avery and Colony of their rights to participate in the NCP.  Neither Avery nor Colony were made parties to the College Park Litigation, and fundamental due process requires that they not be subject to a court order which affects their rights without first being given notice and an opportunity to be heard.  As the Supreme Court stated:

> All agree that "[i]t is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Hansberry v. Lee*, 311 U.S. 32, 40, 61 S.Ct. 115, 117, 85 L.Ed. 22 (1940).  [citations omitted].  This rule is part of our "deep-rooted historic tradition that everyone should have his own day in court."  18

> C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §
> 4449, p. 417 (1981)….   A judgment or decree among parties to a
> lawsuit resolves issues as among them, but it does not conclude the
> rights of strangers to those proceedings.

*Martin v. Wilks*, 490 U.S. 755, 763 (1989); *Steans v. Combined Ins. Co. of America*, 148 F.3d 1266, 1270 ("parties who choose to resolve litigation through settlement may not dispose of the claims of a third party ... without that party's agreement"); *Barham v. City of Atlanta*, 292 Ga. 375, 378-79 (2013) (nonparties have a "due process right to be free from having judicial action taken against them individually without first being afforded notice and a right to be heard on the merits").

In this case, Atlanta claims merely to be complying with the terms of an order from a federal district court, but the City neglects to mention that the **Consent** Order was entered as part of a privately-negotiated settlement agreement between itself and College Park.  Avery and Colony were not parties to the College Park Litigation, nor were they given notice or an opportunity to be heard concerning the proposed amendment to the NCP by the Consent Order.  Thus, the Consent Order cannot control the rights of Avery and Colony.[5]  *Steans*, 148 F.3d at

---

[5] Significantly, the Consent Order does not specifically bar Atlanta from acquiring Avery and Colony's properties.  It merely directs Atlanta to seek to amend its NCP, which Atlanta has attempted to do.  However, the FAA has not approved the amendment.  Thus, Atlanta is not

1270.

### 4. The FAA Must Disapprove of the Proposed Amendment to the 2008 NCP

The FAA must disapprove of the Atlanta's proposed modification to eliminate the authority to acquire multifamily properties within the 70 DNL contour in College Park from its NCP. Otherwise, the FAA would have approved the proposed amendment already. Instead, on November 28, 2012, Lisa Favors of the FAA wrote to Atlanta and stated, "I wanted you to know that I spoke with HQ at the end of last week and they are still flip-flopping on how to deal with this issue." (SMF ¶¶ 70-71.) Thereafter, the FAA directed Atlanta to seek public comment and then resubmit the proposed amendment. (SMF ¶¶ 73-74.) On March 10, 2013, Atlanta published its notice of solicitation of public comments, and then on May 21, 2013, the City resubmitted its proposed amendment to the 2008 NCP. (SMF ¶¶ 75-76.) More than 18 months have passed since the Atlanta first proposed the modification to its 2008 NCP, and the FAA still has not approved. (SMF ¶¶ 78-79.)

Contrast this 18-month delay with the relative speed at which the FAA approved the 3 volume NCP in 2008; it only took four (4) months from filing on

subject to any particular court order barring it from acquiring Avery and Colony's properties pursuant to the NCP.

September 5, 2007, until the FAA published its ROA on January 24, 2008.  (SMF

¶¶ 50-52.)  Moreover, prior to the filing the 2008 NCP, the FAA's employee Scott

Seritt painted a breezy picture of the effort that would be required to amend the

program.  (SMF ¶¶ 47-49.)  In response to Dr. Nissalke's comment that Atlanta

was "quite close to being able to acquire the Wynterbrook Apartments on Camp

Creek," Mr. Seritt responded that that if the Wynterbrook Apartments were within

the 70 – 74 DNL contour, then "we are good to go."  (SMF ¶ 48.)  "If not," Mr.

Seritt continued, "we will need to amend the grant.  **That should be painless and**

**we can do it with a letter amendment**."  (*Id.* (emphasis added.))  When asked for

further explanation, Atlanta testified:

> what it means is if Wynterbrook was located in the 68, and we wanted
> to use AIP-51 for acquisition, then we would -- Scott would need to
> change the language in the grant, and he can do that, like he said, with
> a letter amendment.  It's just simply a letter that says AIP-51 was
> initially defined as this.  We, the FAA, are now going to redefine it as
> that.  It's a one-page letter, couple of paragraphs.

(SMF ¶ 49.)

Given that the FAA claimed to be able to amend the grant with a "painless"

letter amendment, and the fact that the FAA actually did review and approve of the

entire 2008 NCP in a period of about four months, it seems clear that the FAA

could have already approved the proposed Consent Order amendments if it wanted

- 24 -

to do so.  In fact, if the FAA thought the proposed revisions met the criteria set forth in Part 150, the regulations would require the Regional Airports Division Manager to publish notice of receipt of the program in the Federal Register and solicit public comment.  14 C.F.R. § 150.31(c).  Thereafter, the FAA would have a 180-day approval period to consider the program.  14 C.F.R. § 150.31(d).  By contrast, in this case, the FAA has delayed decision for 18 months, which exceeds the 180-day approval period by a longshot.  Plainly the FAA does not approve of Atlanta's most recent proposed modification to the 2008 NCP.

V.  **CONCLUSION**

For the reasons explained above, Avery and Colony request entry of a summary judgment order directing Atlanta to proceed with the acquisition of Defendants' properties pursuant to the terms of the NCP.

Respectfully submitted this 21st day of March, 2014.

CHAMBERLAIN, HRDLICKA, WHITE,
 WILLIAMS & AUGHTRY


By:    s/ F. Beau Howard
       Nicholas S. Papleacos
       Georgia Bar No. 561175
       F. Beau Howard
       Georgia Bar No. 142641

- 25 -

191 Peachtree Street, N.E.                    COUNSEL FOR DEFENDANTS/
Thirty-Fourth Floor                           COUNTERCLAIMANTS AVERY
Atlanta, Georgia 30303                        PARK PARTNERS, LLC  AND
(404) 659-1410                                COLONY CAMP CREEK, LLC
(404) 659-1852 (FAX)
nicholas.papleacos@chamberlainlaw.com
beau.howard@chamberlainlaw.com
1946568_3

## <u>CERTIFICATION OF FONT</u>

Counsel for Defendants/Counterclaimants certifies that this document has been prepared in a Times New Roman, 14 point font and otherwise complies with Local Rule 5.1C.

Respectfully submitted this 21st day of March, 2014.

CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY


By:    s/ F. Beau Howard
       Nicholas S. Papleacos
       Georgia Bar No. 561175
       F. Beau Howard
       Georgia Bar No. 142641

191 Peachtree Street, N.E.              COUNSEL FOR DEFENDANTS/
Thirty-Fourth Floor                     COUNTERCLAIMANTS AVERY
Atlanta, Georgia 30303                  PARK PARTNERS, LLC  AND
(404) 659-1410                          COLONY CAMP CREEK, LLC
(404) 659-1852 (FAX)
nicholas.papleacos@chamberlainlaw.com
beau.howard@chamberlainlaw.com
1946568_3

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I have, this date, filed electronically the foregoing **Brief in Support of Motion for Summary Judgment by Avery Park Partners, LLC and Colony Camp Creek, LLC** with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification to the following attorneys of record:

| | |
|---|---|
| John L. Watkins | Winston A. Denmark, Esq. |
| Roy E. Hadley, Jr. | FINCHER, DENMARK & WILLIAMS, LLC |
| Leslie J. Suson | 8024 Fairoaks Court |
| Thompson Hine LLP | Jonesboro, Georgia  30236 |
| Two Alliance Center | |
| 3560 Lenox Road, Suite 1600 | |
| Atlanta, Georgia  30326-4266 | |

Respectfully submitted this 21st day of March, 2014.

CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY


By:    s/ F. Beau Howard
Nicholas S. Papleacos
Georgia Bar No. 561175
F. Beau Howard
Georgia Bar No. 142641

191 Peachtree Street, N.E.              COUNSEL FOR DEFENDANTS/
Thirty-Fourth Floor                          COUNTERCLAIMANTS AVERY
Atlanta, Georgia 30303                   PARK PARTNERS, LLC  AND
(404) 659-1410                               COLONY CAMP CREEK, LLC
(404) 659-1852 (FAX)
nicholas.papleacos@chamberlainlaw.com
beau.howard@chamberlainlaw.com
1946568_3