**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| THE CITY OF ATLANTA, GEORGIA, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action File No. |
| v. | ) | 1:13-cv-02480-SCJ |
| | ) | |
| AVERY PARK PARTNERS, LLC | ) | |
| d/b/a Avery Park, *et al.* | ) | |
| Defendants. | ) | |
| _____ | ) | |

## PLAINTIFF CITY OF ATLANTA'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON ITS CLAIM FOR DECLARATORY JUDGMENT

Plaintiff The City of Atlanta (the "City") files this Brief in Support of Its Motion for Summary Judgment (the "Motion") on its claim for declaratory judgment against Defendants Avery Park Partners, LLC ("Avery Park Partners"), Colony Camp Creek, LLC ("Colony Camp Creek") (collectively, the "Developers"), and the City of College Park ("College Park").

## I.     PRELIMINARY STATEMENT

The City owns and operates Hartsfield-Jackson Atlanta International Airport (the "Airport"). In prior litigation in this Court between the City and College Park, Chief Judge Carnes signed, on July 30, 2010, a Consent Order, under which the City agreed not to purchase apartment complexes within College Park pursuant to

the Airport's Noise Compatibility Program ("NCP"), which was established under the Aviation Safety and Noise Abatement Act of 1979, 49 U.S.C. § 47501 et seq. ("Noise Abatement Act") and its attendant regulations, 14 C.F.R. 150 ("Part 150").

Developers own two apartment complexes within College Park, which they acquired *after* the Consent Order and *after* they were indisputably aware of its terms. Nevertheless, Developers demand the City acquire their properties under the NCP—thereby also demanding the City violate the valid and binding Consent Order. The City seeks a judgment of its rights and duties with respect to the conflict between the Consent Order and Developers' demands, declaring that (1) the Consent Order is valid and binding and (2) Developers lack any right to acquisition under the NCP and the underlying statutes and regulations.

## II.    STATEMENT OF FACTS

### A.    The Airport's Noise Compatibility Program

The City owns and operates the Airport. (College Park Counterclaim [Doc. 7], ¶3; Developers' Counterclaim [Doc. 8], ¶17). The Airport, acting under the Noise Abatement Act and Part 150, voluntarily established the NCP to increase the compatibility of land use with aircraft noise. (49 U.S.C. §47504(a)(1)-(2); 14 C.F.R. §150.23; Ex. 2, FAA Memo 1-24-2008, p. 1; Ex. 16, Affidavit of Thomas E. Nissalke, Ph. D. ["Nissalke Aff."] ¶5).

2

An airport opting to establish an NCP conducts a "Part 150 Study," which has two primary components. The first is a "noise exposure map" ("NEM"), which identifies the geographic areas—called "noise contours"—most affected by, and deemed potentially incompatible with, aircraft noise (using Federal Aviation Administration ["FAA"] criteria). 14 C.F.R. § 150.21. The second is a Noise Compatibility Program, or "NCP," which outlines the airport's proposed methods of increasing the compatibility of areas identified on the NEM. 49 U.S.C. § 47504; 14 C.F.R. § 150.23. NEMs and NCPs are submitted to the FAA for approval. Once approved, the Secretary of Transportation may grant funds for the airport to choose to execute noise-mitigation projects under the NCP. 49 U.S.C. § 47504(c).

Noise contours on the NEM determine which properties are potentially eligible for benefits under the NCP. Federal regulations require the noise contours be determined by a computer program, called the "Integrated Noise Model," using a noise metric, called "DNL"—"day-night average sound levels" measured in weighted decibels over a 24-hour period. A higher DNL means a higher predicted noise level. The three noise contours are (1) the 75 DNL contour (showing an area of 75 DNL or greater), (2) the 70 DNL contour (70 DNL to less than 75), and (3) the 65 DNL contour (65 DNL to less than 70). 14 C.F.R. §§ A150.101 & B150.5. NEMs are generally updated every five years. (Ex. 1, Deposition of Thomas E.

Nissalke, Ph. D. ["Nissalke Dep."] at 38:14-16). (Exhibits are attached to the City's Statement of Undisputed Material Facts in Support of the Motion).

The Airport's NCP was created through a rigorous process involving substantial input from both private citizens and local governments.[1] See 14 C.F.R. § 150.23(d) & (e)(4). Coordination and scoping meetings[2] were held as far back to February 2003; representatives of College Park attended meetings of the Noise Mitigation Advisory Council, the Land Use Advisory Committee, and the Operations Advisory Committee, which were active throughout the entire course of the Airport's Part 150 Study; a public hearing and information workshop was held in the City of College Park in December 2003; and a full-day public hearing occurred in October 2006 at the Airport Marriott. (Ex. 2, FAA Memo 1-24-2008). The FAA also met three times with the City and College Park to discuss comments and concluded that "[a]ll requirements of public participation have been met" in the Airport's creation of the NCP. (Id.).

---

[1] In fact, Volume III of the Part 150 Study, dated April 30, 2007—which is more than 600 pages in length—documents the public's participation and input.

[2] "The FAR Part 150 Study began with a public scoping process. …The purpose of scoping was to establish lines of communication between the DOA and those involved.… This included the initial coordination with political jurisdictions, related agencies, airport tenants, and interested citizens." (Ex. 3, Part 150 Study, Vol. III, §10.2).

4

In its history, the Airport has adopted two NCPs. The first was adopted in 1984 and, as discussed herein, was the subject of prior litigation. The current NCP, approved by the FAA in 2008, is administered at the discretion of the City's Department of Aviation ("DOA") and allows, but does not require, the DOA to provide the following possible noise-mitigation measures: (1) sound insulation for qualifying properties within the 65 and 70 DNL contours[3] and (2) the acquisition of qualifying properties within or straddling the 70 DNL contour.[4] (Ex. 4, FAA Record of Approval, at Nos. 1 & 3).

---

[3] The FAA Record of Approval, at No. 3, provides for a "**[v]oluntary** sound insulation program for eligible residential buildings in the 65-70 DNL contours. This **voluntary** measure will benefit those eligible residences located between the 2007 NEM 65 and 70 DNL contour by providing them the option to be included in the sound insulation program." (Ex. 4, FAA Record of Approval, at No. 1) (emphasis added).

[4] The FAA Record of Approval, at No. 1, provides for a "**[v]oluntary** property acquisition program for eligible single-family residences and multi-family complexes within the 70 DNL contour. This **voluntary** measure would provide the opportunity for owners and residents of residentially developed property within high noise areas (2007 NEM 70 DNL and greater) to receive fair market value for their property and relocation assistance. Any residential development that occurred after April 10, 1985 that was within the limits of the 1985 70 and greater DNL contour was constructed with the knowledge of the extent of significant noise exposure and would not be eligible for the acquisition program." (Ex. 4, FAA Record of Approval, at No. 3) (emphasis added). The purpose of the date restriction was to deem ineligible for acquisition any residential property that was "constructed with the knowledge of the extent of significant noise exposure." (Ex. 5, Part 150 Study, Vol. II, § 6-4). This is consistent with FAA policy and was approved by it. (Ex. 4, FAA Record of Approval, at No. 3).

Multi-family complexes are potentially eligible for sound insulation and acquisition under the current NCP but were outside the scope of the 1984 NCP. (Ex. 1, Nissalke Dep. at 13:23–14:3; Ex. 5, <u>Part 150 Study</u>, Vol. II, § 6.1).

**B.    The City and College Park's Contentious History Regarding Present and Prior NCPs, Prior Litigation, and the Consent Order**

College Park has long objected to the City acquiring properties—especially multi-family dwellings—within College Park's city limits primarily based on the contention that such acquisitions erode its revenue base, in addition to other grounds. In 2008, College Park brought suit in this Court alleging that the City violated Section 5 of the Voting Rights Act (42 U.S.C. § 1973 <u>et</u> <u>seq.</u>) by authorizing—in the then newly-approved NCP—the potential acquisition of multi-family residences in College Park.[5] After initially granting a temporary restraining order against the City from acquiring any property within the City of College Park, Judge Carnes denied College Park's motions for a three-judge panel (as required by the Voting Rights Act to obtain preclearance), effectively dismissing College Park's complaint.[6] (<u>See</u> [Docs. 6 & 48 in No. 1:08-CV-1464-JEC]). Judge Carnes

---

[5] The prior action was styled <u>City of College Park and Charles E. Phillips, Sr. v.</u> <u>City of Atlanta and Shirley Franklin, in her official capacity as Mayor of the City</u> <u>of Atlanta,</u> No. 1:08-CV-1464-JEC (N.D. Ga.) (the "College Park Suit").

[6] Judge Carnes wrote: "Although single district judges cannot determine the merits of claims alleging a failure to comply with the provision of Section 5, if a plaintiff's challenge is 'wholly insubstantial or completely without merit,' a district

determined that "plaintiffs' allegations do not give rise to claims under Section 5 of the Voting Rights Act." ([Doc. 48 in No. 1:08-CV-1464-JEC, p. 7]). The previously-granted TRO was also vacated. (Id., p. 19).

College Park appealed this decision to the U.S. Court of Appeals for the Eleventh Circuit (see Notice of Appeal, [Doc. 51 in No. 1:08-CV-1464-JEC]; Appellate Case No. 09-12255-FF), which sent the case to mediation. ([Doc. 60 in No. 1:08-CV-1464-JEC], ¶¶7-8). At mediation, College Park and the City settled their dispute and subsequently memorialized it in a proposed Consent Order. (Id.). After hearings, the respective City Councils of both College Park and the City approved the proposed Consent Order. (Id., ¶9; Ex. 6, Legislative Approvals). The Order was then presented to Judge Carnes, who considered the Consent Order, and signed it on July 31, 2010. It was entered on August 2, 2010. (Ex. 7, Consent Order). The Consent Order is now the subject of this litigation.

Under the Consent Order, the City agreed to refrain from acquiring multi-family apartment complexes within College Park, with exceptions for (1) an already-acquired property (called Wynterbrook Apartments) and (2) the potential acquisition of a second property (called Clubhouse Apartments). (Id., § 4). As a

court judge may determine that a three-judge panel is not required." ([Doc. 48 in No. 1:08-CV-1464-JEC, p. 6]).

matter of undisputed fact, the City has abided by the Consent Order by neither acquiring nor attempting to acquire properties within College Park, other than as allowed. (Ex. 8, College Park's Response to RFA Nos. 3-4).

The City also agreed in the Consent Order to amend the NCP to eliminate its authority to acquire apartments within College Park, with one exception for Clubhouse Apartments. (Ex. 7, Consent Order, § 4). The Consent Order sets no deadline for amending the NCP to eliminate this authority. (Ex. 8, College Park's Response to RFA Nos. 5). The Consent Order neither establishes a procedure for amending the NCP nor prescribes a form of amendment. (Ex. 7, Consent Order).

In September 2012, the Airport submitted to the FAA an amendment to the NCP. (Ex. 9, NCP Amendment). At the time, the Airport was preparing a new NEM for 2012 because the prior 2007 NEM was nearing its fifth year. (See Ex. 1, Nissalke Dep. at 38:14-17). The record in this case lacks any evidence that College Park complained, in writing, about the timing of the City's amendment to the NCP.

### C.    **Developers' Properties**

#### 1.    **Background**

Developers are two limited-liability companies (Avery Park Partners, LLC and Colony Camp Creek, LLC), which are both wholly owned by Scott Henderson. (Ex. 10, Developers' Response to Interrogatory No. 10; Ex. 11, Deposition of

8

David Scott Henderson ["Henderson Dep."] at 14:2-21). Mr. Henderson is an experienced real-estate developer and investor who owns thirteen apartment complexes near the Airport. (Ex. 11, Henderson Dep. at 8:7–9:6). Defendant Avery Park Partners owns the multi-family residential complex at 2609 Charlestown Drive, College Park, Georgia 30337 (the "Avery Park Apartments"). (Developers' Counterclaims [Doc. 8], ¶10). Colony Camp Creek owns the multi-family apartment complex at 2800 Camp Creek Parkway, College Park, Georgia 30337 ("Harrington Park Apartments"). (Id., ¶12). (Avery Park Apartments and Harrington Park Apartments will be referred to as the "Subject Properties.")

### 2. Developers Undisputedly Knew About the Consent Order Before Acquiring the Subject Properties.

In September 2010, Henderson, through an LLC not involved in this action, owned the Diplomat Apartments, which are also near the Airport, at 2700 Camp Creek Parkway, College Park, Georgia 30337. (Ex. 11, Henderson Dep. at 11:10-14; 25:22-25). On September 2, 2010, Henderson attended a property owner's orientation concerning the Airport's Noise Insulation Program, which is part of the NCP. (Id., at 27:4-20)  At this orientation—which occurred before the Developers' acquisition of the Subject Properties—Henderson told DOA staff that he wanted the City to acquire the Diplomat Apartments. Henderson was informed that the Consent Order prevented it. (Id., at 28:12–29:12; 30:7-15; 36:25–37:3).

On September 22, 2010, Henderson received from the DOA a copy of the Consent Order in an e-mail that expressly directed his attention to paragraph 4 of the Order, which prohibits the City's acquisition of apartment complexes within College Park. (Id., at 33:16-35:10). In September or October 2010, Henderson was personally informed by the DOA that its acquisition of Diplomat Apartments under the NCP was impermissible without College Park's consent. (Id., at 43:1:23).

Henderson acquired Avery Park Apartments on December 28, 2010, three months after he received the Consent Order. (Id., at 18:16-21; 36:25–37:3). On December 7, 2011, Henderson quitclaimed Avery Park Apartments to Avery Park Partners, which Henderson solely owns. (Id., at 20:3-7.) Colony Camp Creek, which Henderson also solely owns, acquired Harrington Park on November 29, 2010, two months after Henderson received the Order. (Id., at 15:2-20).

It is thus undisputed that the Developers—through their sole owner, Henderson—were aware of the Consent Order before acquiring the Subject Properties. In testifying about his receipt of the Consent Order, Henderson said:

> Q. …[B]asically at this point in time, September 22 of 2010, the folks at the airport were telling you, We can't acquire properties because of this – in College Park because of the consent [order]?
>     MR. HOWARD: Object to the form of the question.
>     BY MR. WATKINS:
> Q. Was that your understanding?
> A. Yes.
> …

10

Q. Okay. If I have the time frame correct here, you acquired both Avery Park and Colony Park after receiving a copy of this consent order?
A. Yes.

(Id., at 35:2-10; 36:25–37:1-3). Henderson testified that he obtained the Subject Properties out of foreclosure at an attractive price, and today both of the Subject Properties are more than ninety percent occupied and cash-flow positive. (Id. at 15:18-24; 20:20-25; 18:9-12; 22:8-19).

### D. The Developers' Attempt to Force the City to Acquire the Subject Properties Under the NCP

Despite their admitted knowledge of the Consent Order before acquiring the Subject Properties, Developers have striven to force the City to acquire them and thereby violate the Order. On December 9, 2011, the Developers served Atlanta Mayor Kasim Reed putative ante litem notices demanding "acquisition of the[ir] [respective] propert[ies]…." (Ex. 12). Then, in July 2012, the Developers, with other complainants, filed an administrative action with the FAA, which is merely a thinly-veiled attempt to force the City to acquire the Subject Properties—even though the FAA has no authority to require the City to do so.[7] The Developers requested the FAA to deny all grant money to the Airport—which, if granted,

---

[7] The administrative action is styled Virginia One Development, LLC, Avery Park Partners, LLC d/b/a Avery Park, DSH Diplomat, LLC d/b/a Diplomat Townhomes, Colony Creek, LLC, and Crossings Townhomes, LLC v. The City of Atlanta, Georgia, FAA Docket No. 16-12-09. The City has answered the administrative complaint and filed a motion to dismiss, which is pending.

ironically would prevent the City from executing the NCP. In April 2013, the Developers, with others, submitted to Mayor Reed, the FAA, and the EPA, another notice-of-intent-to-sue letter. (Ex. 13).

### E.    The Current Lawsuit

The City seeks a declaratory judgment to resolve the conflict between the Consent Order and Developers' demand that the City buy the Subject Properties.[8] The City seeks a declaration that (1) the Consent Order is valid, enforceable, and prohibits the City from acquiring the Subject Properties; and (2) the Developers lack any right to have the Subject Properties acquired under the NCP.[9]

### III.    ARGUMENT AND CITATION TO AUTHORITY

### A.    Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, admissions on file, together with the affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The party seeking summary judgment must demonstrate the absence

---

[8] As shown below, the NCP imposes no such obligation, regardless of the Consent Order.

[9] Developers and College Park assert Counterclaims that are without merit and are the subjects of the City's separate Motions for Summary Judgment, filed contemporaneously herewith.

of a genuine dispute of material fact by showing "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999). When this burden is met, the non-moving party is then required to "go beyond the pleadings and … designate specific facts showing there is a genuine issue for trial." Celotex, 477 U.S. at 324. If the nonmoving party fails "to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then the court must enter summary judgment for the moving party. Celotex, 477 U.S. at 323.

Summary judgment is particularly appropriate where, as here, the material facts are undisputed and only legal issues are involved. Guarino v. Wyeth, LLC, 719 F.3d 1245, 1250-1251 (11th Cir. 2013) (citing Celotex, 477 U.S. at 322). If the Court decides that the Consent Order is valid and consistent with both the NCP and the applicable statutes and regulations, its decision will resolve every issue as a matter of law in the City's favor on its claim for declaratory judgment.

## B.    The Consent Order Is Presumptively Valid and Enforceable.

An order of a Court of competent jurisdiction is presumptively valid and enforceable unless it is "patently unconstitutional" or "transparently invalid" on its face. U. S. v. Marquardo, 149 F.3d 36, 42 (1st Cir. 1998) ("[C]ourt orders carry an

initial presumption of validity … [with] limited exceptions to this rule, for example, where a court issues an order clearly without jurisdiction over the parties or subject matter, or that is 'patently unconstitutional' or 'transparently invalid' on its face") (citing In re Providence Journal Co., 820 F.2d 1342, 1347-48 (1st Cir. 1986)); see also Omasta v. Wainwright, 696 F.2d 1304, 1305 (11th Cir. 1983) (order "presumptively valid" where "issued by a court of competent jurisdiction").

There is no, and can be no, dispute that this Court had jurisdiction over the prior College Park Suit, where the plaintiff asserted federal-question jurisdiction on claims allegedly arising from the federal Voting Rights Act, and the defendant (the City of Atlanta) had no basis for denying that this Court had personal jurisdiction over it. (See Complaint [Doc. 1 in No. 1:08-CV-1464-JEC], ¶¶6-7 (asserting federal-question jurisdiction); see also Answer [Doc. 25 in No. 1:08-CV-1464-JEC]], ¶¶6-7) (admitting this Court's jurisdiction).

The Consent Order is neither patently unconstitutional nor transparently invalid and is thus presumptively valid. Further, in approving the Consent Order, Judge Carnes was required to consider and ensure both that the Order was legal and that the rights of third parties would not be infringed by it. EEOC v. Hiram Walker & Sons, Inc., 768 F.2d 884, 889 (7th Cir. 1985) ("[A] district court must determine whether a proposed [consent] decree is lawful, fair, reasonable, and

14

adequate"); see also U. S. v. DeKalb Cnty., No. 1:10-cv-4039-WSD, 2011 U.S Dist. LEXIS 150490, at *34 (Dec. 20, 2011). Judge Carnes entered the Consent Order only after "having reviewed the record and the arguments of the parties" and finding that the parties had "obtained appropriate governmental approvals of [their] settlement from their respective municipalities." (Ex. 7, Consent Order, p. 1). Absent evidence rebutting the presumption that the Consent Order is legal and enforceable, summary judgment must be granted to the City on its declaratory judgment claim, because the Consent Order prohibits the City from acquiring multi-family apartments within College Park. See U. S. v. O'Callaghan, 500 Fed. Appx. 843, 850 (11th Cir. 2012) (affirming summary judgment where non-movant failed to rebut applicable presumption).

Unless Developers can show that the City is required to purchase the Subject Properties under applicable law or that the Developers' substantive rights were otherwise infringed by the Consent Order, summary judgment must be granted to the City. The Developers can make no such showing.

### C. Neither the Noise Abatement Act, the NCP, Nor Any Other Law Entitles Developers to Acquisition of the Subject Properties.

#### 1. Statutory Background and Regulatory Provisions

Congress adopted the Noise Abatement Act, 49 U.S.C. § 47501 et seq., to establish a voluntary and uniform national program for addressing aircraft noise

from the operation of public-access airports. 49 U.S.C. §§ 47502-47504. The Noise Abatement Act authorized the FAA to regulate "airport noise compatibility planning" and to make federal funds available to reduce incompatible land use that results from aircraft noise. 49 U.S.C. § 47504(c); 14 C.F.R. § 150.3 & 150.05(b). The Airport's NCP was expressly submitted and approved "under the provisions of 49 U.S.C., Section 47504"—i.e., the Noise Abatement Act. (Ex. 14 FAA Record of Decision Letter 1-25-2008).

Participation in NCPs by both airport sponsors and property owners is voluntary. (Ex. 16, Nissalke Aff. ¶5). Under 49 U.S.C. §§47503(a) and 47504(a), "[a]n airport operator may submit a noise exposure map … [and] may submit a noise compatibility program" for approval. (Emphasis added). Part 150 delineates the procedures for an airport's voluntary creation and implementation of NCPs. 14 C.F.R. § 150.21(a) & 150.23(a) ("Each airport operator may … submit … the noise exposure map … [and] … may … submit … a noise compatibility program"). The NCP allows, but does not require, the Airport to acquire qualifying properties located within or straddling the 70 DNL contour and to provide sound insulation for qualifying properties located within the 65 DNL contour. (Ex. 16, Nissalke Aff. ¶¶4-5; Ex. 4, FAA Record of Approval, at Nos. 1 & 3) (referring to "[v]oluntary" property acquisition and sound insulation).

16

## 2.    <u>The NCP Does Not Entitle Any Property Owner to Benefits</u>.

Airports enjoy great latitude in the adoption, amendment, and implement-ation of NCPs so that they can accommodate local interests with the limited resources available. (Ex. 16, Nissalke Aff. ¶4; Ex. 14, FAA Record of Decision Letter) ("Each airport Noise Compatibility Program … is a local program, not a Federal program. The FAA does not substitute its judgment for that of the airport operator with respect to which measures should be recommended for action").

The Airport's Part 150 Study, which was approved by the FAA, emphasizes that no entity is entitled to benefits under the NCP, and it makes clear that such benefits are to be dispensed in the Airport's reasonable discretion based on local considerations and limited funding. The Part 150 Study includes numerous references to the acquisition program's contingency on FAA funding. For example, § 9.2 specifically states that "the mitigation programs [including the acquisition program] depend[] largely on the availability of federal and local matching funds[,]" and § 6.9 and Table 9.2 clearly imply that the property acquisition program was contingent on the Airport's receiving $42 million in necessary funding from the FAA. (Ex. 5, <u>Part 150 Study</u>, Vol. II, §§ 6.9, 9.2 & Table 9.2). Section 6.2 states that the Airport had "<u>evaluated the potential for acquiring residential properties</u> within the 70 DNL contour…." (<u>Id.</u>, §6.2)(emphasis added).

Section 6.2 also states that "[p]roperties <u>potentially eligible</u> for acquisition or sound insulation are shown on Figure 6.2." (<u>Id.</u>). (Emphasis supplied). Figure 6.2 itself is captioned "Properties <u>Potentially Eligible</u> for Acquisition or Sound Insulation." (<u>Id.</u>) (Emphasis added). Section 8.3 refers to the "<u>voluntary acquisition program</u> for residential development located within the 70 DNL or greater noise contours" and states that "[a] review of residential uses within the 70 DNL of the 2007 NEM indicates that approximately 876 residences … would <u>potentially</u> be <u>eligible</u> for acquisition…." (<u>Id.</u>, § 8.3) (emphasis added). A PowerPoint presentation shown at public hearings before submission of the Part 150 Study referred to the "<u>voluntary</u> property acquisition program" and stated that "873 rental units in nine apartment complexes <u>may be eligible</u> for the voluntary acquisition program." (Ex. 3, <u>Part 150 Study</u>, Vol. III, Appx. P, p. 7/slide 32/33)(emphasis added). The same presentation also included a slide showing that 4,963 multi-family homes were "<u>Candidate</u> Properties … That <u>Could Be Eligible</u> for Sound Insulation." (<u>Id.</u>) (emphasis added). Section 6.8 of the Part 150 Study refers to "a general preference for each local political jurisdiction to have the flexibility to set their own priorities." (Ex. 5, <u>Part 150 Study</u>, Vol. II, § 6.8).

Well-established case law also clearly shows that the Developers are not entitled to acquisition or sound insulation under the Airport's NCP. In <u>City of</u>

Atlanta v. Watson, 267 Ga. 185 (1996), the Supreme Court of Georgia rejected an Equal Protection[10] challenge to the Airport's 1984 NCP, which permitted only the acquisition of single-family residences and entirely excluded multi-family residences. The Court noted that the City "opted to participate in a federal noise abatement program" and the decision not to acquire multi-family residences "bears a rational relationship to a legitimate government interest, and therefore did not violate the equal protection rights of the owners of multi-family residences." Id. at 185. The Court stated that the City had the discretion to consider local, particular issues, such as "reducing land usage incompatible with airport noise in a sound fiscal manner while simultaneously avoiding the virtual elimination of the City of College Park's residential basis." Id. at 188. The Court also noted that "the City only had sufficient funds to enable it to purchase single-family homes" and that the City's acquisition of multi-family residences "would have wreaked havoc on the City of College Park's residential base." Id. at 189. For all these reasons, or any one of them, the City's decision not to acquire any multi-family residences had a rational basis, and thus there was no entitlement to acquisition: "the City may draw classifications without violating appellees' equal protection rights so long as such

---

[10] The parameters of Georgia's Equal Protection Clause mirror the federal Constitution. City of Atlanta v. Watson, 267 Ga. 185, 187 (1996).

classifications are reasonable and not arbitrary and have a fair and substantial relationship to the City's legitimate objectives." Id. at 190. In another case, this Court also rejected an essentially identical challenge. Provident Mut. Life Ins. Co. v. City of Atlanta, 864 F. Supp. 1274, 1291-1293 (N.D. Ga. 1994) (rejecting Equal Protection claim against City's decision to provide benefits to owners of single-family residences while excluding commercial-property owners, ruling that "the classification … [is] rationally related to a legitimate state interest").

The Watson court noted that the multi-family complexes in College Park at issue (1) enjoyed high occupancy rates, (2) were affected by aircraft noise far less than other residential structures, and (3) that acquisition of such buildings under the Airport's NCP "wreak[s] havoc" on College Park's tax and infrastructure base. Watson, 267 Ga. at 188-189; see also Provident Mut., 864 F. Supp. at 1293 (noting commercial properties less affected by aircraft noise than single-family homes).

The same remains true today. Henderson testified that the Subject Properties have high occupancy rates and that their residents are readily able to move out—thus indicating that these buildings are less affected by aircraft noise and that residents have the ability to, and often do, move. At the same time, the occupancy rate remains high and Subject Properties profitable:

Q. And what's the occupancy rate at Avery Park?

20

> A. In the 90s. You got turnover, so basically you never get a hundred percent, but it's just a constant move them in and move them out.
> Q. Is that property cash flowing on a positive basis?
> A. Yes.
> Q. … What's the occupancy rate at Harrington Park?
> A. It's—of the rentable unit[s], it stays in the 90 percentile. Both of those properties do extremely well.
> Q. Has that been true the entire time you've owned them?
> A. Yes.

(Ex. 11, Henderson Dep. at 22:9-23).

As such, the City's agreement to the Consent Order, which required it to refrain from acquiring multi-family apartments within College Park, is a rational implementation of the NCP. Moreover, the reasonableness of the City's actions is further shown by the undisputed fact that the Developers remain potentially eligible for benefits under the NCP. However, Henderson admits that he put the issue of sound insulation "on hold" pending the outcome of this action:

> Q. What is the status right now of possible sound insulation at Harrington Park, to your understanding?
> MR. HOWARD: Object to the form. Status with whom?
> MR. WATKINS: Well, with the airport.
> A. I don't know. I mean, I haven't had communications with the airport in a year and a half over all this.
> BY MR. WATKINS:
> Q. Is it fair to say it's on hold?
> A. Yes.
> Q. Same with Avery?
> A. Same with Avery….

(Id. at 47:21-48:8).

### 3.    <u>Private Enforcement of an NCP Is Not Permitted</u>.

That the Developers have no right to force the acquisition of the Subject Properties under the NCP is confirmed by the absence, as a matter of law, of any private right of action under the Noise Abatement Act or Part 150 which would apply here. The NCP provides no private right of action either.[11]

As such, Developers have <u>no</u> basis to force acquisition unless they can demonstrate an implied right of action. However, the U.S. Constitution "strictly curtail[s] the authority of the courts to recognize implied [private] rights of action." <u>Lopez v. Jet Blue Airways</u>, 662 F.3d 593, 596 (2d Cir. 2011) (citing <u>Alexander v. Sandoval</u>, 532 U.S. 275 (2001)). In <u>Sandoval</u>, the Supreme Court held that no private right of action existed to enforce disparate impact regulations promulgated under Title VI of the Civil Rights Act of 1964. <u>Sandoval</u>, 532 U.S. at 293. The Supreme Court concluded that a private cause of action exists only if the enabling <u>statute</u> (rather than the regulations) clearly provides for it:

> [P]rivate rights of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has

---

[11] Developers attempt to assert a Counterclaim under an earlier and inapposite federal statute, the Noise Control Act of 1972, 42 U.S.C. § 4901 <u>et seq</u>. This statute does not provide for the creation of NCPs and has no application to the current dispute, as demonstrated in greater detail in the City's Brief in Support of Its Motion for Summary Judgment on Developers' Counterclaims, at §III(C), filed contemporaneously herewith.

passed to determine whether it displays an intent to create not just a private right but also a private remedy. Statutory intent on this latter point is determinative. <u>Without it, a cause of action does not exist and courts may not create one</u>…. [I]t is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress.

<u>Id.</u> at 286-87 & 291 (emphasis added; internal citations omitted). Adhering to <u>Sandoval</u>, the Eleventh Circuit concluded that there was no private cause of action for alleged disability discrimination under the Air Carrier Access Act of 1986, 49 U.S.C. § 41705, and the regulations promulgated thereunder. <u>Love v. Delta Air Lines</u>, 310 F.3d 1347 (11th Cir. 2002). Because Congress' intent to create a private right action is "the touchstone of [the] analysis[,]" the <u>Love</u> Court held "we simply cannot create by implication a private right of action…." 310 F.3d at 1352, 1360.

The lack of Congressional intent to create an implied cause of action under the Noise Abatement Act is reinforced by the fact that, in addition to not creating or suggesting a basis for a private right of action, the Act contains provisions <u>restricting</u> the right to sue for aircraft noise. Specifically, the Act places "[l]imitations on recovering damages for noise": A person acquiring a property after 1980 may recover <u>damages</u> for noise attributable to an airport only in limited circumstances not present in this case. 49 U.S.C. § 47506. A person who acquires property in an area surrounding an airport and is actually or constructively aware of the existence of an NEM submitted under statutory authority is precluded from

23

recovering damages unless the owner can demonstrate a significant change in airport operations and damages that are proximately caused by the change. (Id.). Here, Henderson (the sole owner of Developers) was admittedly aware of the NEM before he acquired the Subject Properties, just as he was aware of the provisions of the Consent Order. (Ex. 10, Developers' RFA Responses Nos. 5-6; see also Ex. 11, Henderson Dep. at 28:5-22). The Georgia Supreme Court has ruled that this provision preempts state-law claims seeking damages for aircraft noise. Watson, 267 Ga. at 191 ("[T]he Aviation Safety [and] Noise Abatement Act of 1979, of which § 47506 is a part, preempts state law with regard to suits seeking redress for airport noise") (citing Adams v. City of Atlanta, 253 Ga. 581 (1984)).

Further, Developers do not seek damages—which is the only type of claim mentioned in the Noise Abatement Act (and then to establish a federal statutory defense to such claims, rather than to force the City's acquisition of the Subject Properties or to provide sound insulation under the NCP).[12] There is absolutely no evidence, much less "clear evidence[,]" of Congressional intent to create such a cause of action. See Love, 310 F.3d at 1352.

---

[12] See Ex. 10, Developers' Response to City's First Interrogatories, Nos. 6-7) (outlining nature of damages claims).

Since Developers have no right to the relief they seek under the Noise Abatement Act, Part 150, the NCP, or any other applicable law, there is no basis for Developers to claim rights contrary to the provisions of the Consent Order. Accordingly, declaratory judgment as a matter of law in the City's favor is appropriate. So long as the DOA did not grant or deny relief under the NCP on the basis of suspect characteristics—which it did not here—rational basis scrutiny applies, and its discretion should be respected if any reason exists to uphold its decision. Provident Mut. Life Ins. Co., 864 F. Supp. at 1291-1293.

## IV.    CONCLUSION

For all the foregoing reasons, the Motion should be granted.

This 24th day of March, 2014.

/s/ John L. Watkins
John L. Watkins, Esq.
Georgia Bar No. 740515
john.watkins@thompsonhine.com
Roy E. Hadley, Jr., Esq.
Georgia Bar No. 003730
roy.hadley@thompsonhine.com
Attorneys for The City of Atlanta

**Thompson Hine LLP**
Two Alliance Center
3560 Lenox Road, Suite 1600
Atlanta, Georgia 30326-4266
(404) 541-2900 – Main
(404) 541-4266 – Facsimile

25

## **CERTIFICATE OF COMPLIANCE WITH LR 7.1, N.D. Ga.**

The undersigned counsel hereby certifies that this pleading was prepared using one of the font and point selections approved by this Court in LR 5.1C, N.D. Ga. Specifically, Times New Roman font was used in 14 point.

*/s/ John L. Watkins*
John L. Watkins

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing PLAINTIFF CITY OF ATLANTA'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON ITS CLAIM FOR DECLARATORY JUDGMENT with the Clerk of Court using the CM/ECF system, which will send automatic notification of such filing to the following attorneys of record:

> Nicholas S. Papleacos
> F. Beaumont Howard
> CHAMBERLAIN HRDLICKA WHITE WILLIAMS & AUGHTRY
> 191 Peachtree Street, N.E., 34th Floor
> Atlanta, Georgia 30303-1747
>
> Steven M. Taber
> TABER LAW GROUP PC
> Post Office Box 60036
> Irvine, California 92602
>
> Winston A. Denmark
> Destiny S. Washington
> FINCHER DENMARK WILLIAMS & MINNIFIELD, LLC
> 8024 Fairoaks Court
> Jonesboro, Georgia 30236

This 24th day of March 2014.

> /s/ John L. Watkins
> John L. Watkins